Filed 2/26/21  In re Heidi E. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re HEIDI E., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. K.E., Defendant and Appellant. | A159813 (Alameda County Super. Ct. No. JD03018001) |

Mother K.E. appeals from the juvenile court's orders continuing her daughter in out-of-home care and setting an 18-month hearing.  She contends the orders must be reversed because the court failed to make a finding that reasonable reunification services were provided.

**BACKGROUND**

Mother's two children, Heidi and D.G., were removed from her custody on the night of September 5, 2018. Heidi was then 10 years old and D.G. 14 years old.  Police officers responding to a call reporting that mother was beating her children arrested mother on charges of misdemeanor child endangerment.  The officer who contacted the Alameda County Social Services Agency (Agency) related that mother had been drinking and

1

appeared intoxicated, but not "overly" so.  D.G. told the officer mother had slapped her on the face five to seven times, hit her on the shoulder with a coat hanger, and hit her all over her body with a phone charger.  The officer observed linear marks on her shoulder.  Heidi told the officer mother had slapped her several times.

Contacted by the Agency, the maternal aunt said Heidi had texted her saying mother was drunk and was hitting D.G., then around 10:00 p.m. D.G. texted that the aunt needed to "come over right now."  The aunt and maternal grandfather went to mother's home and from outside could hear mother yelling at the girls.  When they went in, the aunt saw marks and bruising on D.G.'s thigh, shoulder, and arm and on Heidi's cheek, arm, and leg.

Both minors told the child welfare worker they did not want to return home and wanted to stay with their aunt and grandfather.  D.G said that on September 4, mother slapped her a few times after finding a picture on D.G.'s phone of her 14-year-old boyfriend in his underwear, grabbing his genitals.  The next day mother called the police about the picture and took D.G. to the boy's high school to make a report to the principal.  When they returned home, mother got drunk and started hitting D.G. on the back of her shoulder with a hanger.  Later, she called D.G. downstairs and began hitting her again, this time on the legs, arm, and back with a phone cord.  Mother also slapped D.G.'s face five to seven times.  D.G. said mother drank to the point of being drunk approximately once a week, and had started drinking more often about a year before, when mother's uncle and grandfather died.  She said mother had hit her on 10 prior occasions "with whatever she can find. Usually a cable or a hanger."

Heidi told the child welfare worker that on the night of September 5, she heard mother yelling and hitting D.G. and was "super scared she was going to hit us a lot." As she was crying in her room, mother came in and hit her on the legs, arms, and back with a phone cord. Heidi said mother had hit her before and caused bruising on a few other occasions. She said mother got drunk about once a week, and the girls stayed in their room when she was drinking because she got "really mad or sad when she's drunk."

The Agency filed a Welfare and Institutions Code[1] section 300 petition on September 6, alleging that mother hit the minors with her hands, a phone cord and a hanger, resulting in marks and bruises on both minors, and had been arrested for child endangerment (§ 300, subd. (a)); the minors reported mother drank to intoxication approximately once a week, became extremely angry or sad, and would yell at or hit them when she was drinking. They avoided her when she had been drinking because they were afraid of her and they did not want to live with her (§ 300, subd. (b)). The Agency had been unable to contact mother to assess her ability to have custody of the children and the alleged father reportedly lived in Mexico and did not have legal custody of either minor (§ 300, subd. (g)).

The detention report, in addition to relating the facts underlying the allegations, stated that the family had been involved with the Department of Children and Family Services in 2010, after a maternal uncle sexually abused D.G., and that the children said they had witnessed domestic violence between the parents when they were very young. The maternal aunt and step-grandfather expressed interest in having the minors placed with them

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

3

but the Agency was unable to approve their home on an emergency basis and the children were placed in a resource family home.

The court ordered the minors detained at a hearing on September 10, 2018.

In its September 21, 2018 report, the Agency recommended that the court find the petition true, declare the minors dependents of the court, and order out-of-home care for the children and reunification services for mother. The child welfare worker related that mother admitted she "may have slapped D.G. a few times" on September 4 after finding the picture on her phone, but denied it made any mark; she denied hitting Heidi on September 5, or causing any bruises, but said the phone cord hit Heidi accidentally. Mother told the child welfare worker that Heidi had " 'stabbed her in the back' and 'betrayed her' "; D.G. was a " 'narcissist' "; the minors were "only afraid because she 'yells a lot' " and were " 'ungrateful' "; and having the minors out of her care would "allow her to focus on applying to law school and paying off her debts." Mother later told the child welfare worker she wanted the minors to come home, denied hurting them or using items to hit them, and said the minors were "exaggerating things because they do not know what 'real abuse is.' " She acknowledged drinking heavily after the death of her uncle, who was a father figure to her, but only for a short time. She said she would sometimes have "a few beers" at home and the girls do not bother her because they know when she is drinking she wants to " 'be relaxed.' " Mother said she can stop drinking whenever she chooses without issue. D.G. told the child welfare worker mother drinks every day and said she did not want to return home until mother got help for her alcohol use. Heidi did not want to return home but would choose home over staying in the foster home; her preference would be to live with her aunt. Heidi said the September 5

4

incident was not the first time mother left bruises on the girls, but was the first time she was " 'super scared' " of mother.

On September 24, 2018, mother waived her right to trial and submitted on the social worker's report. The court found the allegations of the amended petition[2] true, removed the children from mother's custody, and ordered family reunification services. Mother's case plan identified service objectives of not using physical punishment, staying sober and appropriately parenting the children, and required her to engage in both individual counseling and family therapy, complete a parenting education class, participate in a drug and alcohol assessment, and follow the resulting recommendations, including but not limited to participating in a substance abuse treatment program and drug and/or alcohol testing.

For the six-month status review in March 2019, the Agency recommended maintaining the out-of-home placement and reunification services and granting the Agency discretion to begin a two-week trial visit. Child Welfare Worker Stephanie McWoods reported that mother had made partial progress on her case plan and was diligently working to complete it; her "strength" was her "commitment to her daughters" and her "areas for growth" included skills and techniques for conflict resolution with the minors. Mother had completed a parenting class in which she was reported to have been actively engaged, and had been visiting the minors regularly on Saturdays at the Gathering Place. Mother and the minors began family therapy in February 2019. Mother began individual therapy, but stopped going because of vehicle problems; McWoods had tried to contact the therapist without success and in January 2019, gave mother another referral for individual counseling.

---

[2] The petition was amended to include the children's full names.

5

Mother reportedly did not believe she had a substance abuse problem. She had been assessed at Terra Firma, which developed a treatment recovery plan including creating a healthy support system by attending Alcoholics Anonymous (AA) meetings. According to the program director, Bertha Cuellar, "[t]he mother is combative and not interested in completing the program. Based on the assessment she could benefit from the 24-week program." Mother had been participating in substance abuse testing, and had provided 33 negative test results between September 2018 and February 2019, with two missed tests in February. According to Cuellar, mother was doing 72-hour ethyl glucuronide tests on Tuesdays and Fridays to cover the entire week; she was not providing random samples due to her full-time work schedule and commute distance. Four of mother's samples were "dilute," reflecting water consumption. Cuellar stated, "[t]he more dilute the test the mother provides the more suspicious it appears." Mother said she had a medical condition, idiopathic hypersomnia, for which she was prescribed Ritalin, and had to drink more water with this medication.

Heidi and D.G. were both "incredibly concerned" that if they returned home they would not be able to see their aunt, with whom mother had a contentious relationship. Heidi was participating in individual counseling once a week, focused on developing coping skills, and decreasing anxiety.

At the six-month review hearing on March 11, 2019, the court found mother had made partial progress on her case plan, return of the children would create a substantial risk of detriment to their safety protection or physical or emotional well-being, and reasonable services had been offered or provided. The court gave the Agency discretion to start overnight visits and a two-week trial visit.

On April 11, 2019, at an interim review hearing, McWoods informed the court that mother had moved to the lowest level of supervision for visits, family therapy was going well, and a worker in the Family Preservation Program (Family Preservation) had been assigned to the case. Mother was on a wait list for individual therapy and McWoods planned to make another referral for her. Counsel for the minors suggested, due to the trouble mother was having participating in all the services given her work schedule, and based on a recommendation from Terra Firma, that mother address her substance abuse in individual therapy rather than doing the 24-week alcohol treatment program. The Agency was open to this suggestion and the court responded by removing any requirement that mother test a certain number of times as a condition of overnight visits.

In July 2019, the Agency recommended returning the minors home under a family maintenance plan. Mother and D.G. agreed with the recommendation but Heidi did not. McWoods reported that mother had been "supportive and patient with the minors despite Heidi not being interested in returning home." Heidi was unsure about returning home because "if we live with our mom she might hit us"; she said she was not ready to return because she was concerned mother had not changed her "old behaviors of yelling or using alcohol" and asked if she could be placed with her aunt. Although Heidi said she enjoyed the girls' first overnight with mother on April 26 at the end of May, mother reported that Heidi was not participating in all their scheduled visits. In June, Heidi stayed with mother for the first week of a two-week trial visit, then spent the remainder with her aunt. She told McWoods that mother had not yelled at or hit her or D.G. and she could tell mother was "trying to hold it together." McWoods reported that the Agency was worried the aunt was not supportive of reunification and "her close bond

7

with the minor Heidi is encouraging the minor to refuse to return home." The Agency and mother were concerned that the minors were being forced to choose between a relationship with mother or with the aunt.

McWoods reported that mother was "willing to do outpatient/relapse prevention classes but does not think she needs them." Mother had had 10 negative urinalysis tests between March 14 and May 1, 2019, and Cuellar said she "appears to be abstaining and her delusions do not seem to be an indication that she is drinking." McWoods commented that mother had a busy schedule, working full time in Cupertino and struggling with transportation as her car was not working. Mother had been referred to a new individual therapist on April 19, 2019, family therapy was continuing, and a referral had been made for in-home family therapy. In May, mother told Yi Cheng, the Family Preservation child welfare worker, that she was going to start a new job and, because she would have a probationary period, would not be able to participate in the case plan during working hours, only on weekends.[3]

At a hearing on July 15, the court returned D.G. to mother's care and, with respect to D.G.'s case, found the agency had provided reasonable services and complied with the case plan.[4] The previously scheduled August 26, 2019, 12-month review hearing date was vacated and a hearing to contest the Agency's recommendations as to Heidi was set for October 15.

---

[3] Mother had been working at Apple in Cupertino; the new job, at Amazon in Sunnyvale, began on May 14, 2019.

[4] At the hearing, a new judge had taken over the case.

8

Subsequent delays resulted in the hearing taking place over several dates in late 2019 and early 2020.[5]

Heidi's court appointed special advocate (CASA) reported that Heidi had hesitations about overnight visits with mother and recommended she remain in her placement and continue therapy with mother to build trust. Heidi reportedly felt mother was not genuine with the family therapist and other service providers, worked at leaving a good impression, and only got frustrated when she was alone with the minors. Heidi believed mother was still drinking alcohol and had overheard an argument between mother and mother's boyfriend during which she thought she heard mother slap the boyfriend. She also expressed concern about mother's strictness with school: If she or her sister got a C on a test, mother would have them memorize a chapter from a book word-for-word and get upset if they were unable to do this.

The Agency continued to recommend that Heidi return to mother's home with a family maintenance plan and Heidi continued to oppose this recommendation. In mid-August, when contacted during a visit at mother's home, Heidi said everything was fine. A few weeks later, she said she was concerned about going home because she was afraid mother would yell at her or hit her, she was worried about not being able to see her aunt or go out with friends, and "I just don't trust my mother." In November, mother told McWoods she felt disappointed that Heidi was no longer visiting with her and instead was visiting with her aunt.

Cheng reported that she had worked with mother, the minors, and the family therapist to develop a "Prevention Plan" addressing mother's alcohol

_____

[5] On October 15, 2019, the hearing was continued after counsel for the minors declared a conflict with respect to D.G.

9

abuse and appropriate parenting methods[6] and mother was "open-minded" and "played an active role" in this process. Cheng was working with mother to develop realistic expectations of the children and not use physical discipline. Cheng stated the Agency was worried that mother's expectations of the minor exceeded the minor's developmental ability to meet them, and that mother had "felt discriminated against throughout her dependency case and had focused on clearing her name instead of acknowledging areas where she can improve her and her children's relationship." Cheng observed that Heidi's "view and interpretation of the things occurring around her, her mother, or sister appears to be with a lot of fear" and suggested this "might be related to her Conflicted PTSD [Post-Traumatic Stress Disorder] Diagnosis."

Mother continued to test negative for alcohol and other substances. She had asked to stop testing in July, but McWoods advised her to continue because of the contested case. In December 2019, the frequency of testing was reduced to twice a month.

At the contested hearing, Heidi testified that she stopped going to visits with mother because of "things that happened when I went there." One example was that mother had tried to hit D.G. a couple of times; D.G. "dodged" the attempts. Another was that Heidi was uncomfortable being at

---

[6] The prevention plan, which mother and the child welfare workers signed in May 2019 and was discussed with both minors, stated that the parties had agreed mother needed to maintain an alcohol-free lifestyle; mother would not use physical discipline, the family would work with the family therapist to develop mutually agreed "rules/disciplines/methods" to handle disagreements and yelling would not be used; reasonable "House Rules and expectations (cleaning, laundry, meal preparation, computer and cell phone use) needed further discussion; and visitation arrangements for the minors and maternal aunt and grandfather would be discussed.

mother's home because she did not have her own space there and had to stay in the living room. She still had a bed in the room she used to share with D.G. but she felt D.G. was angry with her for not wanting to return to mother's home. Asked if she felt comfortable sleeping in that room, Heidi replied, "yeah, I guess . . . I mean, I don't really know." Heidi was also uncomfortable with mother asking her about the case and why she did not want to come home.

Heidi testified that on one visit over the summer, she and mother were lying on mother's bed talking about Heidi having gone to Great America and Heidi turned away because she felt pressured by mother's questions. Mother grabbed her arm, turned her around and put her hand on Heidi's chin to make Heidi look at her. Heidi felt mother was touching her "aggressively" and was afraid mother would hit her. On another occasion, she overheard mother yelling at mother's boyfriend and thought she heard mother slap him. She recognized the sound from when mother hit her and it scared her. Heidi was also worried mother was still drinking alcohol. She testified that during a visit over the summer she saw mother drink at least two beers at a party, then mother threw up on the way home, which Heidi had seen happen before when mother drank a lot.

Heidi did not feel mother was acting like herself in family therapy and did not think they were making much progress. Mother had not apologized for what had happened or reassured Heidi that she would not hit her anymore or had stopped drinking. Heidi was still afraid of mother and wanted to live with her maternal aunt. She testified she had told McWoods why she did not want to go home, but McWoods did not seem interested.

Cheng testified that she determined it was safe for Heidi to be returned to mother's care based on the facts that mother kept all her appointments

11

with Cheng, continued to submit clean drug tests, and participated consistently in weekly family therapy; weekend visitation had been without major incident, and mother maintained a full-time job and housing. Additionally, D.G. felt comfortable returning home and Cheng had not heard of any reports of physical abuse while D.G. was in mother's care. Cheng testified that the frequency of mother's substance abuse testing was reduced to once a week on Saturdays, at mother's request, to accommodate mother's work schedule. In Cheng's view, mother complied with her case plan, albeit "[n]ot 100 percent" because she had not completed individual therapy. Cheng testified that she had to look at the whole situation, which included mother's need to keep her job and pay rent, as well as the child's safety, and mother had explained her new job did not give her flexibility and the referred therapist did not have time that fit her schedule.

Cheng testified that when Heidi reported the Great America incident, she was asked whether mother hit her and replied that mother "almost slap[ped]" her. Mother denied hitting Heidi and, at Cheng's request, provided a written explanation of the incident.[7] Cheng was satisfied and she did not view the incident as "related to physical abuse." Cheng acknowledged that Heidi had been diagnosed with PTSD based at least in part on mother's physical abuse and alcohol abuse, and that in these circumstances, a parent acting aggressively could trigger a PTSD reaction in the child. Cheng

---

[7] Mother's written statement related that when she asked what Heidi had done over the weekend, Heidi said she had gone to Great America with her aunt; mother asked how she had gotten in because mother had the season pass and when Heidi said her aunt had requested a new one, mother told Heidi it was not okay for the aunt to do this and Heidi needed to ask mother's permission. Heidi rolled her eyes, said she was tired, turned around and fell asleep.

investigated Heidi's report that mother almost hit D.G. and determined it was unfounded because D.G. said there was no hitting or yelling.[8]

McWoods testified that mother had complied with her case plan except for individual therapy, as to which her work schedule created a "significant barrier." She did not think individual therapy was a significant portion of the reunification plan because her understanding was that culturally it was not the "most appropriate" way to support mother. McWoods testified that the Agency was looking for behavioral change, not just submission to services, and she felt mother was addressing what could have been addressed in individual therapy through family therapy and "other coping skills that she identified during this dependency case."

McWoods did not have any concerns about returning Heidi to mother's care because of mother's "demonstrated behavioral changes," effort to accommodate Heidi, and "interest in wanting to show Heidi . . . that things will be different in the household." McWoods had observed mother become more receptive to constructive criticism and sensitive to Heidi, allowing Heidi space when Heidi did not want to visit, and no longer badgering Heidi or forcing her to do things she did not want to do. McWoods noticed mother "differentiating" the two girls and their personalities and interests, and trying to accommodate Heidi—for example, by inviting her on trips planned with Heidi's interests in mind.[9] Mother remained "passionate," but was "more thoughtful," "less reactive," and more able to "talk herself down."

---

[8] Cheng had not met with Heidi in person since August 15, 2019, when D.G. returned home. She testified that Family Preservation provides three to four months of services, and her role had terminated at that point.

[9] One such trip would have been to an animal preserve, as Heidi is an animal rights activist. Another was a family trip to Mexico that Heidi declined to attend.

McWoods testified that Terra Firma initially recommended a formal alcohol treatment plan for mother but over time changed its assessment, notifying the Agency in June 2019, that mother did not need substance abuse treatment other than testing. McWoods acknowledged that mother did not believe she had an alcohol problem, was resistant to a treatment program from the beginning of the case, and did not participate in individual therapy after being offered the alternative of addressing addiction and relapse prevention in that context. Asked about Heidi's report that mother drank and became ill, McWoods testified that Heidi believed mother had some drinks at a restaurant because mother threw up in the car afterward, but mother adamantly denied drinking and said she just became ill.

McWoods testified that the Great America incident did not meet the standard for abuse. According to McWoods's notes, in discussing Heidi's role in the incident, McWoods advised Heidi that "she must also keep herself safe" and "being disrespectful to her mother is not an appropriate way to keep herself safe." McWoods was not concerned about Heidi's physical safety in this incident but rather her emotional safety. She "[a]bsolutely" felt Heidi could be returned home with services that would eliminate the risk to her emotional well-being including maintaining Heidi's CASA, continuing individual and family therapy, and referring the case to a program that would provide a parent advocate for mother and a mentor for Heidi.

Heidi's CASA, who had been meeting with the minor approximately once a week for about 10 months, testified that Heidi was "not quite comfortable" going home and felt "a lot of things" had not changed. In addition to the issues mentioned in the CASA's written report, Heidi felt mother had not attempted to address Heidi's concerns and was uncomfortable

14

with mother trying to talk to her about the case outside the context of family therapy.

Mother testified that after her substance abuse assessment in September 2018, she was told she had a mild alcoholic problem and was instructed to call daily to find out when she needed to test; she knew she would have to test twice a week but did not know which days she would have to go. She was told that she had two tests in which the samples were too diluted, and explained that she used to drink a great deal of water because of a medication she was taking. The random testing continued until June 2019, when mother asked to test once a week because D.G. wanted to spend more time with her, and the Agency agreed. In January 2020, the testing requirement was reduced to once a month. Mother testified that her case plan included attending AA meetings and she did three online sessions through a website given to her by D.G.'s social worker.

Mother did not feel she needed individual therapy, but believed family therapy was beneficial to her and the children and agreed to continue if Heidi was returned to her care. Mother explained that after attending several sessions of individual therapy, she had been unable to continue because her car broke down and with her job in Cupertino, it was hard to manage parenting classes, drug testing, therapy, and visitation.[10] Efforts to find a therapist who could see her on weekends were unsuccessful. She told McWoods she did not believe she needed individual therapy because she was participating in family therapy, and McWoods did not require her to continue looking for an individual therapist. Mother believed she was in compliance with everything she needed to do for her case plan.

[10] Her car was not repaired until January 2020. She borrowed a car in May 2019 for two months.

15

Mother denied having grabbed Heidi and turned her around when they were discussing Great America. She denied drinking at the party as Heidi reported, testifying that she got sick on the way home due to eating food she had ordered to be delivered because there was no vegetarian food at the party. Mother believed Heidi misunderstood the situation because mother was sitting at a table with people who were drinking. The party was on a Saturday night and she had tested at Terra Firma that afternoon. Mother testified she had not had any alcohol or used physical punishment on Heidi since September 2018.

Asked whether she had done anything to reassure Heidi she would not drink alcohol in the future, mother testified she had tried talking to her, but Heidi did not want to talk about it. Mother testified, "I kind of tell her that I love her, and if I did make any mistakes in the past, that that's not going to happen again. And that she can see that things have changed a lot, but how am I going to prove that to her like completely if she's not even around, and she's not even talking about it?" Mother testified that she had learned from her parenting class to show and tell her children she loves them, not be too strict and "not be physical" in a way that might make them feel unsafe, and on visits, she tried to communicate with Heidi and have a better understanding of what Heidi wants and needs.

With respect to the original allegations, mother acknowledged she was under the influence of alcohol and hit D.G., but denied hitting her with a cord or hitting Heidi. She felt Heidi was sometimes "a little too sensitive to things," did not think Heidi was afraid of her, just "afraid of when I raise my voice," and did not believe Heidi did not trust her. She testified that Heidi did not want to come home for "other reasons"—she wanted to live with her aunt and felt she had more freedom not living with mother.

16

After hearing arguments from counsel and reviewing the transcripts, the juvenile court ruled that returning Heidi to mother's care would create a substantial risk of detriment to her safety, protection, or physical or emotional well-being. The court stated as the factual basis for this finding that mother had "not participated regularly and made substantive progress in court-ordered treatment programs, nor made substantial progress in complying with the case plan, nor alleviated or mitigated the causes necessitating out-of-home placement. The court found mother's compliance with the case plan as it related to Heidi had been "minimal" and, in a detailed explanation of its ruling, found mother was not a credible witness while Heidi was highly credible; was critical of both mother's failure to participate in aspects of the case plan and the Agency's acceptance of these failures; and expressed concern that family therapy was focused on D.G. and the case workers minimized Heidi's expressed fears. In sum, the court found mother "is not aware, is not reflective, has not made the substantial level of growth and progress and amelioration that is required for the youth to safely return home."

This appeal followed.

## DISCUSSION

Mother contends the Agency failed to provide reasonable reunification services. Specifically, she argues the juvenile court made no finding as to whether reasonable services were required, and the court's criticisms of the services preclude finding they were reasonable. Consequently, mother maintains she should be provided additional services and time to address the remaining protective issues identified by the juvenile court.

"Under the statutory scheme, review hearings are held every six months, at which time the juvenile court determines, among other things,

17

whether the child welfare agency has offered the parent reasonable reunification services.  (§§ 366.21, subds. (e), (f), 366.22, subd. (a); *Cynthia D. v. Superior Court* (1992) 5 Cal.4th 242, 249.)  At the six- and 12-month review hearings, the standard of proof for the reasonable services finding is expressly clear and convincing evidence.  (§ 366.21, subd. (g)(1) & (2).)" (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594.)  If reasonable services were not offered or provided, the parent must be offered additional services and time for reunification.  (*In re K.C.* (2012) 212 Cal.App.4th 323, 334 [error to terminate services where evidence did not support finding reasonable services were offered or provided]; *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1256 [extension of services beyond 18 months where reasonable services not provided].)

Respondent agrees that the trial court did not make the requisite finding as to whether reasonable services were provided, but argues that mother forfeited any challenge on this basis by failing to raise the issue in the juvenile court.  Dependency matters are subject to the rule that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court."  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293)  "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected."  (*Ibid.*)  While application of the forfeiture rule is not automatic, "the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue."  (*Ibid.*)  "Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters.  'Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions

18

Code.' (*In re Chantal S.* (1996) 13 Cal.4th 196, 200.)  Because these proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance.  (§ 366.26.)" (*Ibid.*)

Here, the juvenile court's failure to make a finding as to whether reasonable services were offered or provided could easily have been rectified if the issue had been brought to the court's attention.  We recognize, however, the practical reality that mother's attorney was unlikely to have had this issue in mind at the hearing since mother and the Agency were aligned in arguing for Heidi's return.

In any event, if we overlook the forfeiture, it remains mother's burden to affirmatively demonstrate prejudicial error.[11]  She has not done so, as there is ample evidence the Agency did offer reasonable services.  Because the standard of proof for the juvenile court was clear and convincing evidence, the question for us is "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making this

---

[11] Respondent argues that any error by the juvenile court in failing to make a reasonable services finding was harmless because the remedy mother seeks is additional time and the juvenile court effectively provided that remedy by continuing the matter to the 18-month hearing.  This argument is misplaced.  Due to continuances and delays, the contested hearing did not conclude until shortly before the February 24, 2020 date previously set for the 18-month hearing.  After issuing its ruling on February 14, 2020, the court discussed this timing issue with counsel and then continued the matter to February 24, 2020, at which time it was continued to March 11, 2020.  Even with the continuance to March 11, 2020, the time afforded by the juvenile court's continuance of this matter was only a month.  Moreover, had mother prevailed on her claim that reasonable services were *not* provided, she would have been entitled to not only additional *time* but additional *services*.

assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

Mother argues that finding the Agency provided reasonable services would conflict with the juvenile court's stated views regarding the Agency's case plan. In particular, the court found the substance abuse plan "insignificant" because mother's substance abuse testing was not random and she did not participate in a treatment program. Since the Agency accepted the testing regime established at Terra Firma and the program's communication in June 2019, that mother did not need the treatment program, and considered mother in compliance with the substance abuse aspect of her case plan, mother views any deficiency in the plan as the fault of the Agency, not mother.

The juvenile court, however, clearly viewed mother as having manipulated the system to avoid random testing. The court stated: "It was soon somehow acquiesced, manipulated or decided, in large part by the mother, that the testing schedule didn't work for her work schedule, and at some point, her testing dates became known to her. . . . [¶] There was evidence that Mother had allegedly been clean and not tested positive for alcohol since about March of 2019. But the court's determination and conclusion is that a large part of her testing was on dates and times that she would know were set to occur."

These remarks indicate the deficiency the juvenile court found was less in the services offered than in what mother did with them. This view is supported by the evidence. In addition to testing, the case plan called for

20

mother to follow the recommendations of the substance abuse assessment, including "participating in a substance abuse treatment program and drug and/or alcohol testing," but mother reportedly was "combative and not interested in completing the program" recommended by Terra Firma as a result of mother's assessment. It was only in June 2019, some nine months into the reunification period, that Terra Firma informed the Agency mother did not need the program; prior to that, the evidence indicates, mother had resisted the recommendation. Similarly, the court noted that the treatment plan called for mother to attend AA meetings and found mother's attendance of at most three online sessions "not sufficient compliance with the case plan or coming close to treating what seems to be an alcohol problem."

The court expressly found mother lacked credibility as a witness—in general and with respect to substance abuse[12]—and found Heidi "the most credible of all witnesses," specifically referring to Heidi's detailed description of mother drinking at a party and becoming ill on the way home. In the court's view, mother "progressively sought fewer and fewer tests and very few random tests," leaving the court without confidence that mother was "alcohol-free" or had "turned the corner on an alcohol problem."

Other problems the court identified were clearly with mother's compliance, not the services offered. The court found mother "did not comply

_____

[12] The court found that mother's diluted samples were "in fact, dirty tests," stating "mother's explanation at trial as to drinking a lot of water was not credible." The court continued, "In fact, Mother, as a witness, the court finds to be not credible, as I observed her throughout the trial. [¶] Her explanations to the court just don't make sense. Her demeanor, her physical emotions to witnesses of shaking her head yes or no, giving counsel who are cross-examining her what I would describe as the side eye, her lateness to court at the last court date, and in the totality, just her explanations for an attempt to contradict the testimony of the child, Heidi, was just not believable."

21

with her case plan of individual therapy," attending only a few sessions and making clear she did not believe she needed individual therapy. Again, the court viewed the Agency as having "acquiesce[ed]." The court stated, "I think the workers just sort of gave up. I've never had a case where the workers seemed to, in large part, ignore the needs of the child and bend over backwards because the parents have a job. Many of our parents work. That doesn't excuse them from compliance with the case plan. It doesn't excuse them from having to make changes to ameliorate the reasons the child or the children were removed."

The evidence shows that mother found it difficult to attend individual therapy, as well as participate in her other services because of her work schedule and long commute. The agency tried to assist in finding a therapist who could see mother on weekends but was unable to find one available. The court's view that this did not excuse mother from engaging in this aspect of the case plan was reasonable, especially in light of mother's expressed belief she did not need individual therapy. As the court pointed out, mother's history of physical abuse of the children and alcohol use, and the "anger in the parenting styles that were evidenced in the testimony in court," indicated there was "something wrong that could be benefitted by individual therapy" for mother. More than a year into the dependency, Heidi was consistently expressing her fear and lack of trust in mother, to the point that she refused to participate not only in visits with mother but in a family trip to Mexico and another trip planned specifically to appeal to her interest in animals.[13] Yet despite all the months of family therapy, mother did not believe Heidi was afraid of her or did not trust her, and thought Heidi was "a little too sensitive to things." The Agency appropriately included individual therapy in the case

---

[13] See footnote 9, *ante.*

plan and did what it could to accommodate mother's schedule; mother's inability or unwillingness to find a way to fit individual therapy into her schedule does not mean the Agency failed to provide reasonable services.

It is evident from the juvenile court's remarks that the court disagreed with the Agency's handling of this case with regard to Heidi. The court was concerned that the family therapy was "in large part . . . focused on the older sibling," noting that records attached to the Agency's reports identified D.G. as the person receiving treatment and Heidi was "barely, if at all, referenced." Noting Heidi's testimony about being afraid when her mother drinks and the many times the record showed Heidi having told an Agency worker she was afraid of her mother, the court commented, "yet nobody from the Agency seems to be taking heed of that. Instead they seem to minimize what Heidi is afraid of."[14] The court noted Heidi saying her mother was "acting for the adults" and "things really aren't what they seem to be" and agreed: "I have to say that is the court's conclusion as well." The court also expressed concern about McWoods's note regarding the Great America incident, which said she advised Heidi that she "needs to maintain her safety by being respectful." The court found this an indication that Heidi's needs were not being heard and addressed, stating, "Part of the safety plan should not be Heidi is subject to physical abuse or being grabbed or yanked around on the bed when she turns away from her mother during an argument."

The court's concern that the Agency was not sufficiently attending to Heidi's distinct issues is troubling, of course. But this bears more on the Agency's assessment of the family situation than the services it offered

---

[14] The court illustrated the degree to which Heidi felt unsafe with mother by reference to the evidence that she declined to go on a family vacation to Mexico or on a proposed trip to an animal preserve that mother planned specifically for Heidi.

mother. The components of the case plan were designed to address the physical abuse of both minors and mother's alcohol use. The family therapy notes which led the juvenile court to conclude therapy focused largely on D.G. were for February through May 2019. Family therapy was on-going, including after D.G. returned to mother's care in July 2019, and, according to the October 15, 2019 report of Heidi's CASA, in August 2019, Heidi and mother began once a week counseling together in addition to the family therapy with D.G. This evidence supports a conclusion that services were directed at issues relating to Heidi, even if the case workers were insufficiently attuned to her needs. The issue on this appeal is provision of reasonable services, not the Agency's evaluation of the case.

" ' "Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.'. . ." The department must make a " ' "good faith effort" ' " to provide reasonable services responsive to the unique needs of each family. . . . "[T]he plan must be specifically tailored to fit the circumstances of each family . . . , and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. . . ." . . .The effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success. . . . The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case. . . . "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . ." ' [Citations.]" (*In re K.C., supra,* 212 Cal.App.4th at pp. 329–330.) " 'The

24

standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re J.E.* (2016) 3 Cal.App.5th 557, 566, quoting *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

These standards were met here. The juvenile court was critical of the Agency's acceptance of mother doing scheduled rather than random substance abuse testing, not participating in a substance abuse treatment program and not engaging in individual therapy, all of which the court viewed as alterations of the case plan at mother's request due to the demands of her schedule. More significantly, the court disagreed with the Agency's assessment that it was safe to return Heidi to mother's care. But, as we have explained, none of this means mother was not offered reasonable services aimed at remedying the identified problems presented in this case.[15]

## DISPOSITION

The order is affirmed.

---

[15] As was acknowledged in the juvenile court proceedings, this case is unusual in having the Agency recommend return of a child who adamantly opposes returning to parental care. It is not surprising that mother portrays herself as blindsided by the juvenile court's rejection of the Agency's recommendation to return Heidi to her care when the Agency reported mother was complying with her case plan and making positive behavioral changes. But the juvenile court viewed mother as having manipulated the situation so as to give the appearance of progress the court did not believe to be established. The court found Heidi to be "the most credible of all witnesses" and believed her fears and lack of trust were genuine; the court expressly rejected mother's contrary explanations as lacking credibility. These are determinations to which we must defer.

25

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.


*In re Heidi E.* (A159813)